**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Antonina Seredina,

        Plaintiff,

v.

W.L. Gore & Associates Incorporated,

        Defendant.

No. CV-24-08031-PCT-SMM

**ORDER**

Before the Court is Defendant's Second Motion for Summary Judgment. (Doc. 84). The Motion is fully briefed. (Docs. 84; 88; 102). For the following reasons, the Court grants in-part and denies in-part the Motion. (Doc. 84).

**I.    BACKGROUND**

**A. Accommodations**

Plaintiff, Antonina Seredina ("Ms. Seredina"), is deaf and her primary language is American Sign Language ("ASL"). (Doc. 89 ¶ 1). English is her fourth language, and she is not fluent in reading or writing in English. (Id. at ¶ 2). Ms. Seredina worked as an Operator at Defendant W.L. Gore & Associates, Inc. ("Gore") from March 2006 until her termination on May 8, 2023. (Id. at ¶ 4).

When Ms. Seredina started her employment with Gore, she signed a Vountary Disclosure of Disability Form, in which she stated that she was deaf, but could communicate through "written language" and "ASL." (Doc. 85 at ¶ 2). In other communications, Ms. Seredina stated that she was deaf and acknowledged that she had

an interpreter paid by Gore for the monthly Plant Meetings. (Id. at ¶ 3). Ms. Seredina contends that there was not an interpreter provided for every Plant Meeting in 2023. (Doc. 90 at ¶ 3). Nor did Gore provide an interpreter for a biweekly meeting on February 14, 2022. (Id. at ¶ 4). Gore often submitted requests for interpreters months in advance. (Id. at ¶5; Doc. 85 at ¶5). In addition to regularly scheduled meetings, Ms. Seredina could request interpreters when she wanted to discuss anything outside such meetings, but Gore allegedly did not always provide an interpreter when requested. (Id. at ¶ 6; Id. at ¶ 6).

Ms. Seredina acknowledges that she did not need a full-time interpreter to perform her job, and that the interpreter would not have been doing anything while Ms. Seredina was working. (Doc. 85 at ¶ 8). Gore contends that such a request would not have been reasonable given that it paid between $69 and $89 per hour for interpreters, with additional service and travel fees, which is two to three times Ms. Seredina's ending hourly wage of $27.25. (Id. at ¶ 9).

In addition to providing Ms. Seredina in-person interpreters, Gore set up a dedicated station for Sorenson, a video relay service. (Id. at ¶ 10). Sorenson allows Ms. Seredina to see a live ASL interpreter on the screen who translates her signed words to a person on the phone and the other person's spoken words to Ms. Seredina in ASL. (Id. at ¶ 11). Ms. Seredina uses Sorenson to communicate outside of work, including with friends, healthcare providers, and even her attorneys during this litigation. (Id. at ¶ 12). She also used Sorenson to communicate with the EEOC. (Id. at ¶ 13). At Gore, Ms. Seredina often used Sorenson to communicate but was not allowed to use it if the nature of the conversation was confidential.[1] (Id. at ¶ 14). Further, Ms. Seredina could not use Sorenson for group meetings because it requires participants to be in separate rooms. (Doc. 90 at ¶ 14).

For virtual meetings, Gore provided Ms. Seredina with closed captioning, which allowed her to read what was being said during the meeting. (Doc. 85 at ¶ 16). But in 2023, Gore's daily standup meetings for operators were held in-person instead of

---

[1] Moreover, if she did not like the interpreter on Sorenson, she could ask to switch interpreters or simply hang up and call again. (Doc. 85 at ¶ 15).

virtually. (Doc. 90 at ¶ 16). In 2023, Gore held virtual daily meetings for employees in the role of "process champions." (Id.) Ms. Seredina was not a process champion in 2023. (Id.) Thus, her daily meetings in 2023 were held in-person with no closed captioning. (Id.) Further, Ms. Seredina contends that even for the few virtual meetings she attended, the closed captioning moved too fast for her to read what was being said at the meeting. (Id.) Additionally, although Ms. Seredina's native language is Russian, she never asked for the closed captioning to be changed to Russian. (Doc. 85 at ¶ 17). Gore contends that it would provide Ms. Seredina materials and summaries for meetings, but Ms. Seredina contends that Gore would rarely provide her with any written materials for meetings. (Id. at ¶ 18; Doc. 90 at ¶ 18).

Additionally, Ms. Seredina taught biweekly ASL classes on Gore's campus often with the assistance of in-person interpreters and paid her for teaching the classes and her coworkers for attending. (Doc. 85 at ¶ 19). Ms. Seredina contends that Gore's performance reviews specifically discussed teaching the ASL classes as part of her job duties to improve communication among the team. (Doc. 90 at ¶ 19). Ms. Seredina also contends that Gore did not provide an in-person interpreter for the ASL classes on January 26, 2023, or February 9, 2023. (Id.) Mr. Harrell, Ms. Seredina's last supervisor, who has some hearing loss in one ear, learned ASL and interpreted for Ms. Seredina when an interpreter was not there. (Doc. 85 at ¶ 21). Ms. Seredina acknowledges that Ms. Harrell was nice, made good faith efforts to communicate with her, and was a good supervisor. (Id. at ¶ 23).

Ms. Seredina also often communicated (inside and outside of work) through written emails, instant messages, text messages or handwritten notes. (Id. at ¶ 25). Further, Ms. Seredina knows how to read lips, but is not fluent in lip reading. (Id. at ¶ 26; Doc. 90 at ¶ 26). Ms. Seredina knows basics, like greetings, and uses body language in combination with lip reading to try communicating when there are no other options available. (Id.)

Gore's accommodations and different communication methods allowed Ms.

Seredina to work at Gore for 17 years. (Doc. 85 at ¶ 27). But Ms. Seredina contends that Gore's accommodations and different communication methods did not allow her to work in the same capacity as her able-bodied coworkers. (Doc. 90 at ¶ 27). Further, Ms. Seredina never received any disciplinary or performance improvement documentation. (Doc. 85 at ¶ 28). Ms. Seredina did not complain about the now-alleged lack of accommodations to Gore's Human Resources, or through the Integrity Helpline, which allows employees to report such concerns. (Id. at ¶ 30). Ms. Seredina contends that she repeatedly complained to Gore's leadership that its accommodations were inadequate. (Doc. 90 at ¶ 29). Further, Ms. Seredina did not contact the EEOC during her employment. (Doc. 85 at ¶ 31).

### B. May 2023 Incident

On May 3, 2023, Ms. Seredina approached Mr. Harrell. (Id. at ¶ 32). Gore contends that, during this conversation, Ms. Seredina got upset, started yelling, and made gun signs with her hands and allegedly stated "boom, boom, boom" while pointing her finger guns at Mr. Harrell. (Id. at ¶ 40). Ms. Seredina does not dispute that she got upset and made a hand gesture resembling a gun, however, she contends that she does not know if she was yelling or what sounds she was making because she is deaf. (Doc. 90 at ¶ 40). Ms. Seredina also contends that she did not point at Mr. Harrell or any of her coworkers. (Id.) Gore contends that Mr. Harrell immediately told Ms. Seredina that her statements were not okay, however, Ms. Seredina contends that Mr. Harrell said nothing to her. (Id. at ¶ 41; Doc. 85 at ¶ 41). Ms. Seredina went back to work but left the facility 20 minutes later. (Id. at ¶ 42). Mr. Harrell reported the conversation to his leader, who escalated it to Human Resources. (Id. at ¶ 43). The next day, Ms. Seredina went out on a scheduled vacation. (Id. at ¶ 44).

Gore contends that Ms. Seredina did not go to Mr. Harrell to complain about a lack of interpreters or other accommodations. (Id. at ¶ 33). Instead, Gore contends that Ms. Seredina was frustrated about what she perceived to be a lack of rotation among stations. (Id.) Further, Ms. Seredina contends that her complaints about a lack of rotation

were due to prior communication issues from not having an interpreter or other accommodations.[2] (Doc. 90 at ¶ 33). Ms. Seredina did not ask Mr. Harrell to speak through Sorenson, in writing, or request an interpreter. (Doc. 85 at ¶¶ 37-38).

On May 8, 2023, Michelle Kulovitz ("Ms. Kulovitz"), a Human Resource Associate, contacted Ms. Seredina to set up a call. (Id.) Ms. Seredina told Ms. Kulovitz to call her through Sorenson later that day.[3] (Id. at ¶ 45). Ms. Kulovitz called Ms. Seredina through Sorenson. (Id. at ¶ 46). Gore contends that during that call Ms. Seredina admitted that she made the gun signs. (Id. at ¶¶ 50-51). Ms. Seredina contends that she did not understand what was being asked during the call, and that there were several misunderstandings during and after the call. (Doc. 90 at ¶¶ 50-51). Ms. Seredina further contends that an in-person interpreter could have cleared up that she was not trying to sign an actual gun or make a threat at all. (Id. at ¶ 51). Gore contends that Ms. Seredina's actions violated Gore's Associates' Standards of Ethical Conduct and Workplace Violence and Weapons Policy, on which she had received training. (Doc. 85 at ¶ 53). Ms. Seredina contends that the last training occurred in 2012, consisted of a presentation, and there was no testing to ensure employees understand the policies. (Doc. 90 at ¶ 53). Further, Ms. Seredina contends that Gore did not provide her an interpreter to explain the policies, no one from Gore checked to see whether she understood the policies, and she did not understand the policies. (Id.)

Subseqntly, Ms. Seredina sent Ms. Kulovitz a text message to try to clarify her side of the story but did not admit to trying to say gun. (Doc. 90 at ¶ 55). Ms. Seredina also sent Mr. Harrell a text message in which she stated, "I'm sorry, I shouldn't say bad words, I'll miss Gore." (Doc. 85 at ¶ 56). Ms. Seredina contends that she was apologizing for a poor gesture choice and did not admit that she was tying to say "gun" with the gesture. (Doc. 90 at ¶ 56).

---

[2] Although Plaintiff had injured her shoulder at work the year before, she was not at the station where she was injured on this date. (Doc. 85 at ¶ 35).
[3] Plaintiff was in Anaheim, California at the time, with two friends, one of whom did not know any sign language, and another who signs very slowly and "could barely finger spell." Plaintiff communicated with her friends through signing and body language, and would try to lip-read but had limitations. (Docs. 85 at ¶¶ 47-48; 90 at ¶ 48).

Gore contends that Ms. Seredina has identified no other employee who behaved similarly and is still employed. (Doc. 85 at ¶ 73). But Ms. Seredina contends that Gore retained an employee after saying they were going to "throat punch someone." (Doc. 90 at ¶ 57). Gore also contends that it separated other employees for similar conduct. (Doc. 84 at 5). For example, Gore separated an employee who made comments about slitting her wrists with a razor blade in the manufacturing area. (Doc. 85 at ¶ 58). But as Ms. Seredina contends, Gore retained the referenced employee for over a month after she made violent threats, even though she had made similar comments in the past. (Doc. 90 at ¶ 58). Gore separated another employee for making comments about shooting or intimidating others with his gun. (Doc. 85 at ¶ 59). But as Ms. Seredina contends, Defendant retained the employee referenced for weeks after he made some of the alleged violent threats before ultimately terminating him. (Doc. 90 at ¶ 59).

Gore contends that Ms. Seredina's story regarding the gun signs has changed multiple times before and even during this litigation. (Doc. 84 at 5). Gore contends that Ms. Seredina admitted making the gun signs to Ms. Kulovitz on May 8, 2023. (Doc. 85 at ¶ 60). But Ms. Seredina contends that she did not understand what was being discussed during the call. (Doc. 90 at ¶ 60). Later, Ms. Seredina sent a letter to Gore's CEO stating that she "only pointed and gestured" to Mr. Harrell, who she stated had "misinterpreted her signs. (Doc. 85 at ¶ 61). She also claimed she was separated due to this "miscommunication." (Id. at ¶ 62).

Later, Ms. Seredina met with an EEOC investigator. (Id. at ¶ 63). Ms. Seredina told the investigator that "she used the sign of shooting a gun so that [Mr.] Harrel[l] could understand her frustration." (Id. at ¶ 64). After Plaintiff received her Notice of Right to Sue and filed this lawsuit, she amended her Charge. (Id. at ¶ 66). The purported Amended Charge stated she "tried to communicate with Mr. Harrel[l] using a gesture which is commonly used in sign language to express frustration and means 'I am fed up with this.' I later learned that my gesture was misinterpreted as a threat of violence against Mr. Harrel[l]." (Id. at ¶ 67). She repeated this statement in her Second Amended Complaint.

(Id. at ¶ 68). Likewise, in her Fourth Amended Complaint, Ms. Seredina stated that she did not learn until after her termination that "[Mr.] Harrell was claiming one of Plaintiff's gestures during their Ma[y] 3, 2023, meeting was a threat of violence." (Id.) Moreover, in her initial discovery responses, Ms. Seredina denied making the gun signs. (Id. at ¶ 69).

A few days after her deposition, Ms. Seredina changed her discovery responses to admit that she made the gun signs at Mr. Harrell, and that she had admitted the same to the EEOC investigator. (Id. at ¶ 71). But Ms. Seredina clarified in her supplemental responses that she admits she made a gesture of a gun with her hands but denies that she was expressing any intent to shoot anyone. (Doc. 90 at ¶ 69). Ms. Seredina contends that she corrected inaccurate information, which she is required to do under Fed. R. Civ. P. 26(d). (Id. at ¶ 71). Further, during her deposition, Ms. Seredina admitted making the gun signs and sounds, and acknowledged that the gun gesture was "not a good sign." (Doc. 85 at ¶ 72). But Ms. Seredina disputes that the hand gesture was meant to convey the word "gun" or a threat towards another person. (Doc. 90 at ¶ 72). Gore contends that Ms. Seredina's argument now is that she was justified in making gun signs because she was frustrated and did not intend to shoot anyone. (Doc. 85 at ¶ 73). But Ms. Seredina contends that her position is that the hand gesture was not intended to convey a threat, but Gore took it as a threat because there was no interpreter to clear up the miscommunication. (Doc. 90 at ¶ 73). Gore also contends that Ms. Seredina does not take responsibility for her actions. (Doc. 85 at ¶ 74). However, at Ms. Seredina's deposition, she asked Gore to clarify what it meant when she was asked whether she takes responsibility for her actions that contributed to her termination but Gore refused to clarify. (Doc. 90 at ¶ 74).

## C. Procedural History

Gore previously filed a Motion for Partial Summary Judgment on Ms. Seredina's claims other than her discrimination claim based on her termination. (Doc. 40). The Court partially granted the Motion. (Doc. 80). As the Court held, Ms. Seredina failed to exhaust administrative remedies as to her hostile work environment claim and granted summary

judgment on that claim. (Id. at 9). The Court also held that "[a]s the Charge of Discrimination was filed on November 18, 2023, Plaintiff's window to allege unlawful employment practice extends back to January 22, 2023, three hundred days prior." (Id. at 11). Based on this, the Court held Ms. Seredina's discrimination claim based on alleged failure to promote was untimely and granted summary judgment. (Id. at 12). The Court also granted Gore summary judgment on all of Ms. Seredina's claims under the Arizona Civil Rights Act. (Id.). Thus, the only remaining claims are Ms. Seredina's discrimination, retaliation, and failure to accommodate claims under the ADA, and only to the extent she can show an unlawful employment practice between January 22, 2023, and her termination on May 8, 2023. (Id. at 13).

## II.    LEGAL STANDARD

The purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010). "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine

issues for trial." Id. As the Ninth Circuit has said, "[t]his burden is not a light one." Id. To meet this burden, the "non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." Id. Additionally, parties opposing summary judgment are required to "cit[e] to particular parts of materials in the record" establishing a genuine dispute or "show[ ] that the materials cited do not establish the absence ... of a genuine dispute." Fed. R. Civ. P. 56(c)(1). A district court has no independent duty "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).

### III.   DISCUSSION

Gore moves for summary judgment on Ms. Seredina's (1) disability discrimination, (2) retaliation, and (3) failure to accommodate claims under the Americans with Disabilities Act ("ADA"). (Doc. 84 at 2). For the following reasons, the Court grants in-part and denies in-part Gore's Motion.

### A. Disability Discrimination

Gore contends that Ms. Seredina cannot make out a prima facie case for disability discrimination because the moment she made gun signs and sounds at Mr. Harrell she was no longer qualified for her position, and even if Ms. Seredina could establish a prima facie case for discrimination Gore had a legitimate, nondiscriminatory reason to end her employment. (Id. at 7-8). But Ms. Seredina contends that she can establish a prima facie case for discrimination, and that Gore's lack of a thorough investigation establishes pretext. (Doc. 88 at 14-15).

Courts apply the McDonnell Douglas burden-shifting framework to disability discrimination claims, under the ADA, at the summary judgment stage. Curley v. City of N. Las Vegas, 772 F.3d 629, 632 (9th Cir. 2014). "Under that framework, an employee challenging an adverse employment action has the initial burden of establishing a prima facie case of discrimination." Mayo v. PCC Structurals, Inc., 795 F.3d 941, 943-44 (9th Cir. 2015). To establish a prima facie case of disability discrimination, an employee must show: "(1) he is a disabled person within the meaning of the statute; (2) he is a qualified

individual with a disability; and (3) he suffered an adverse employment action because of his disability." Id. at 944. The employee must show that there is at least a causal connection between the disability and the employment action. Hutton v. Elf Atochem N. Am., Inc., 273 F.3d 884, 891 (9th Cir. 2001). If the employee meets the initial burden, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. Mayo, 795 F.3d at 944. If the employer fails to do so, then the burden shifts back to the employee to prove that the reason given by the employer was pretextual. Id.

### 1. Prima Facie Case

First, it is undisputed that Ms. Seredina has a disability—she is deaf. (Docs. 84; 88). Thus, Ms. Seredina establishes the first element of her prima facie case.

Second, the ADA prohibits discrimination against a "qualified individual with a disability." 42 U.S.C. § 12112. A qualified individual "means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment." 42 U.S.C. § 12111(8). Gore contends that Ms. Seredina cannot establish a prima facie case of discrimination because the moment she made gun signs and sounds at Mr. Harrell she was no longer a qualified individual. (Doc. 84 at 7). In response, Ms. Seredina contends that she was a qualified individual because she performed the essential functions of her job with or without reasonable accommodations. (Doc. 88 at 7). Further, Ms. Seredina contends that Gore's misunderstanding of a single-hand gesture did not render her unqualified for her position. (Id.)

Gore relies on the Ninth Circuit's holding in Mayo v. PCC Structurals, Inc. to argue that Ms. Seredina was unqualified for her position and, thus, cannot make out a prima facie case for discrimination. 795 F.3d at 941; (Doc. 84 at 8). In Mayo, the Ninth Circuit held that "[a]n employee whose stress leads to serious and credible threats to kill his co-workers is not qualified to work for the employer, regardless of why he makes those threats." Id. at 944-45. The holding applies regardless of whether the individual is disabled or has frustrations in some way relating to his or her disability. See id.

However, the Ninth Circuit cautioned that they "only address[ed] the extreme facts before [them]. . . an employee who makes serious and credible threats of violence toward his co-workers." Id. at 945 n. 4. In Mayo, the employee "threaten[ed] to kill his co-workers in *chilling detail and on multiple occasions* (here, at least five times)." Id. at 944 (emphasis added). That "vastly disproportionate reaction demonstrated that [the employee] could not perform an 'essential function' of his job, and was not a 'qualified individual.'" Id. The Ninth Circuit further noted that they "do not suggest that off-handed expressions of frustration or inappropriate jokes necessarily render an employee not qualified." Id.

Upon review of the record, the Court finds that this case does not resemble the severity of the threats of violence in Mayo. Gore contends that Ms. Seredina went to see Mr. Harrell to express her frustration, began yelling at him, and made gun signs and sounds directly at Mr. Harrell. (Doc. 84 at 9). Gore also contends that Ms. Seredina's actions were threatening, and they are not excused by her disability, the fact that she was upset (or even what she was upset about), or that she did not actually intend to get a gun and start shooting others in her workplace. (Id.); see Mayo, 795 F.3d at 944; see also Curley, 772 F.3d at 633.

In response, Ms. Seredina contends that the threatening conduct of the plaintiffs in Gore's cited cases were extreme and pervasive in a manner far different from Ms. Seredina's conduct. (Doc. 88 at 8). For example, as Ms. Seredina notes, the plaintiff in Mayo made remarks towards multiple coworkers over a significant period of time, and planned to go to his work and kill people. Mayo, 795 F.3d at 942. In that case, the plaintiff said, among other things, that he "fe[lt] like coming down [to his work] with a shotgun an[d] blowing off the heads of the supervisor and another manager," that his "co-worker need not worry" because "she would not be working the shift that the killing would occur," and that he "planned to 'com[e] down [to work] on day [shift] . . . to take out management." Id.

Additionally, in Curley, the plaintiff "over the course of several years [] had

numerous verbal altercations with coworkers, made insensitive remarks about a fellow employee's motorcycle accident, damaged City property, and made several threats of violence against coworkers." 772 F.3d at 630. In Curley, the court did not find that the plaintiff was not qualified, but rather that the plaintiff could not establish pretext. Id. at 632.

The facts here are akin to an "off-handed expression of frustration" that the Ninth Circuit cautioned about in Mayo. Nothing in the record suggests that Ms. Seredina had any prior history of threatening to kill her co-workers. In fact, Ms. Seredina received positive evaluations and was apologetic when she sent a text message to Mr. Harrell about her hand gesture: "I am sorry. I shouldn't say bad words, I'll miss Gore." (Doc. 85-7 at 7).

Accordingly, the Court finds that Ms. Seredina's single, nonverbal gesture, made during a failed attempt to communicate without an interpreter, may not render her unqualified for her position. Thus, Plaintiff satisfies the second element of her prima facie case.

Last, the final factor of a prima facie case for employment discrimination is whether Ms. Seredina's termination was an adverse employment action that has a connection to her disability. Bates v. United Parcel Serv., Inc., 511 F.3d 974, 994 (9th Cir. 2007). An employee bears the burden of proving that she was discriminated against "because of" a disability. Id. (quoting 42 U.S.C. § 12112(a)).

Gore contends that it did not terminate Ms. Seredina because of her disability. (See Doc. 84 at 9). It is undisputed that Gore learned Ms. Seredina was deaf before she even started working there 17 years earlier. (Id.)Gore also provided accommodations for years, including the provision of in-person ASL interpreters and a dedicated station where she could use Sorenson to communicate through a virtual interpreter. (Id. at 9-10). Gore also contends that Ms. Seredina admits that Mr. Harrell, the person to whom she made the gun signs and sounds, was nice to her, made good-faith efforts to communicate with her, and was a good supervisor. (Id.) Further, neither Mr. Harrell nor anyone else at

Gore had ever disciplined Ms. Seredina before the incident that led to her termination. (Id.)

In response, Ms. Seredina contends that her termination sprouted from a conversation with her supervisor where she was complaining about issues that related to her disability, and that the actual termination occurred because of a miscommunication that stemmed from her disability. (Doc. 88 at 9). Specifically, Ms. Seredina contends that during the incident in question she spoke to Mr. Harrell regarding past issues with her accommodations. (Id. at 12). Ms. Seredina contends that she was unable to effectively communicate with Mr. Harrell during the conversation because there was no interpreter or effective alternative means of interpreting. (Id.) Ms. Seredina further contends that there would be no offensive hand gesture "but-for" her being deaf. (Id.) Ms. Seredina premises this on the fact that there were less misunderstandings and no arguments when an interpreter was present, and that Gore possibly misunderstood the gesture because there was no one available to explain how a gesture in ASL can mean something completely different in English based on the handshape, facial expressions, body language, and context. (Id.)

Ms. Seredina contends that the miscommunication compounded during her call with Ms. Kulovitz because she did not have the means to explain what happened. (Id.) Ms. Seredina further contends that, while they were able to use Sorenson, she did not understand the questions Ms. Kulovitz was asking due to issues with translations and internet reception. (Id.) Ms. Seredina contends that she was only put in this position because she is deaf. (Id.)

The Court finds that Ms. Seredina's conduct may not have occurred if she was not deaf and that it is a question of fact for a jury to decide. Thus, Ms. Seredina establishes the last element of her prima facie case because "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1139-40 (9th Cir. 2001) (reversing summary judgment where there was an actual question whether employee's absenteeism

- 13 -

was because of her OCD); Gambini v. Total Renal Care, Inc., 486 F.3d 1087, 1094 (9th Cir. 2007) (holding that an employee was entitled to a jury instruction stating that if it found the employee's conduct was caused by or was part of her disability, it could find that the employee was fired because of her disability). Therefore, Ms. Seredina has established a prima facie case of discrimination under the ADA, and there is a genuine dispute of material facts over why she was terminated.

2.   Evidence of Pretext

If the plaintiff establishes a prima facie case, the burden shifts to the defendant who must articulate legitimate, non-discriminatory reasons for the challenged action. McDonnell Douglas, 411 U.S. at 802. If the defendant meets this burden, the plaintiff must finally show that the "reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2008) (internal citation and quotations omitted). An explanation is not worthy of credence where it is internally inconsistent or otherwise not believable. Chuang v. Univ. of California Davis, Bd. Of Trustees, 225 F.3d 1115, 1127 (9th Cir. 2000).

Further, evidence of pretext "must be both specific and substantial." Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1062 (9th Cir. 2002). However, at the pretext stage, a plaintiff's burden is low, and "very little[ ] evidence is necessary to raise a genuine issue of fact regarding an employer's motive." Opara v. Yellen, 57 F.4th 709, 723-24 (9th Cir. 2023) (quoting McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1124 (9th Cir. 2004)). "Nevertheless, a plaintiff must present some evidence that goes to the defendant's motivation—either by directly showing that it was discriminatory or by contesting the defendant's claimed motivation." Kama v. Mayorkas, 107 F.4th 1054, 1059 (9th Cir. 2024) (citing Villiarimo, 281 F.3d at 1063; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is

false, may [be enough].”). If there is "abundant and uncontroverted independent evidence" supporting the defendant's stated motive, then "plaintiff's 'creat[ion of] only a weak issue of fact as to whether the employer's reason was untrue' will not suffice." Opara, 57 F.4th at 724 (quoting Reeves, 530 U.S. at 148).

In this case, Gore articulates a non-discriminatory reason it terminated Ms. Seredina—she made gun signs at Mr. Harrell. (Doc. 84 at 13). Thus, the burden shifts back to Ms. Seredina to show that the reason is pretextual. Id. at 804.

Ms. Seredina contends that Gore's "insincere investigation" in response to her hand gesture shows pretext and contends that the investigation was different from other similarly situated employees. (Doc. 88 at 12-13). Ms. Seredina provides the following examples of similarly situated employees at Gore:

First, a Gore employee, another operator, had several incidents over the course of several months where she complained about working with a coworker, threatened to "throat punch someone," referred to another employee as a "retard," and told her supervisor "this is bullshit" when asked about a problem on the manufacturing line. (Id.) This employee received verbal counseling in January 2023, then a "final written warning" in April 2023. (Id.)

Second, another Gore employee talked about blowing people's heads off, needing to "roll out with his gun," having a gun in his pants, said he felt like he was "barely holding it together, " referred to coworkers as useless, said he "needed to roll up in there with a gun and take what's owed to him," and said that if he did not receive his paycheck in time "there is going to be hell to pay." (Id.) In that case, there were interviews with multiple coworkers who said they were worried about the employee bringing a gun and shooting everyone. (Id.) Still, that employee was allowed to return to work for several days over the course of weeks before he was terminated. (Id.)

Third, another Gore employee had a history of making comments about self-harm and told her supervisor she was "thinking about cutting myself from wrist to elbow." (Id.) A few days later she said, "I want to slit my fucking wrists." (Id. at 13-14). Gore met with

her to ask if she was comfortable speaking about it further and whether she made the statements. (Id. at 14). She was only terminated after Gore considered other options, and Gore's security team performed a thorough security screening with interviews of the employee, her coworkers, and use of a security assessment tool, the WAVR-21. (Id.)

Ms. Seredina contends that her termination was significantly different from the similarly situated Gore employees because there was no thorough investigation. (Id.) In this case, Gore only spoke to the supervisor involved, Mr. Harrell, and declined to get Ms. Seredina's explanation through an in-person interpreter. (Id.) Further, Ms. Kulovitz started her call by telling Ms. Seredina that she said, "I am so angry, I could go get a gun. . ." (Id.) Yet, Mr. Harrell testified in his deposition that he was not aware of Ms. Seredina making any verbal statements and it would not be possible to discern any verbal statements if she made any. (Id.) Before her call with Ms. Seredina, Ms. Kulovitz had already written in her notes that Ms. Seredina admitted to the allegations against her. (Id.) Unlike for other employees, Ms. Seredina had no history of violent threats, write-ups, prior verbal or written warnings, or a completed threat assessment. (Id.) Further, Ms. Seredina contends that Gore did not investigate her prior disciplinary record, any disagreements she may have had with coworkers, or her access to weapons before making its decision to terminate her employment.[4] (Id.)

Accordingly, the Court finds that Ms. Seredina demonstrates pretext and denies Defendant's Motion on her disability discrimination claim because there remains a genuine dispute of material facts for a jury to decide.

### B. Retaliation

Gore contends that Ms. Seredina cannot make out a prima facie case for retaliation because she did not engage in a protected activity at any point close to her termination.

---

[4] Gore asks the Court to follow an unbinding case that holds that a thorough investigation is not required if an employer can show it honestly and in good faith believed the reasons for an employment decision. See Jones v. Wal-Mart Stores, Inc., 2009 WL 2382435 (D. Ariz. Aug. 3, 2009); (Doc. 102 at 6). But the Court declines to follow that unbinding case.

(Doc. 84 at 12). In response, Ms. Seredina contends that she establishes a prima facie case of retaliation because complaints about lack of accommodations constitute protected activity under the ADA and her termination was casually related to her protected activity. (Doc. 88 at 10).

ADA retaliation claims are subject to the McDonnell Douglas burden-shifting framework. Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000). "To make out a prima facie case of retaliation, an employee must show that (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." Id. If a plaintiff establishes a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nonretaliatory reason for its decision. Id. If the defendant articulates such a reason, the plaintiff bears the ultimate burden of proving that the reason was merely pretext for a retaliatory motive. Id.

First, as established above, termination is an adverse employment action. Thus, Ms. Seredina establishes the first element of her prima facie case for retaliation.

Second, complaints about insufficient accommodations constitute protected activity under the ADA. Pardi v. Kaiser Found. Hosps., 389 F.3d 840, 850 (9th Cir. 2004). In this case, Ms. Seredina raised concerns about accommodations in the months and weeks before her termination, which included complaints about the absence of interpreters for meetings and not being able to communicate with supervisors. (Doc. 88 at 10). Further, Ms. Seredina contends that her May 3, 2023, conversation with Mr. Harrell is a protected activity because it was related to her concerns about accommodations. (Id.) Ms. Seredina contends that she was complaining about how the lack of station rotations stemmed from a breakdown in communication over insufficient accommodations. (Id.)

Gore contends that Ms. Seredina's complaint to Mr. Harrell on May 3, 2023, did not constitute protected activity. (Doc. 84 at 12); see Learned v. City of Bellevue, 860 F.2d 928, 932 (9th Cir. 1988) ("the opposed conduct must fairly fall within the protection of [the statute] to sustain a claim of unlawful retaliation."); see also EEOC v. Crown

Zellerbach Corp., 720 F.2d 1008, 1013 (9th Cir. 1983) ("The employee's statement cannot be 'opposed to an unlawful practice' unless it refers to some practice by the employer that is allegedly unlawful."). Gore contends that Ms. Seredina complained about what she perceived to be a lack of rotation among the different stations on the manufacturing line; not discrimination, lack of accommodation, or any other activity prohibited under the ADA. (Doc. 84 at 12-13).

The Court finds that Ms. Seredina engaged in a protected activity. Ms. Seredina raised concerns to Gore about accommodations in the months and weeks before her termination, which included complaints about the absence of interpreters for meetings and not being able to communicate with supervisors. (Doc. 88 at 10). But whether Ms. Seredina establishes that her communication with Mr. Harrell during the May 2023 incident is a protected activity under the ADA is a factual dispute for a jury to decide.

Lastly, Ms. Seredina must establish that a causal link exists between the protected activity and the adverse employment action. Ray, 217 F.3d at 1240. A plaintiff can demonstrate a causal link when the "temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases." Bell v. Clackamas County, 341 F.3d 858, 865 (9th Cir. 2003).

Ms. Seredina contends that she expressed frustration in her conversation with her supervisor, which ended up being misunderstood due to communication issues from her disability that directly led to her termination. (Doc. 88 at 11). Ms. Seredina also contends that Gore canceled a previously scheduled meeting to address its accommodation failures after her termination. (Id.) Further, Ms. Seredina points out that Gore declined her request for a post-termination meeting with an interpreter. (Id.)

Gore contends that even if Ms. Seredina's conversation with Mr. Harrell could be considered protected activity, she cannot establish that Gore ended her employment because of her protected activity. (Doc. 84 at 13). Gore contends that the fact that Ms. Seredina was terminated shortly after making the gun signs at Mr. Harrell establishes that

she was terminated for a reason that was unrelated to her complaints about accommodations. (Id.); Kama, 107 F.4th at 1060 ("Evidence of temporal proximity is less persuasive if it also supports a defendant's independent reason for an adverse action."). Gore also contends that it never disciplined Ms. Seredina nor took any adverse action until she made a gun symbol with her hand and aimed it at her supervisor. (Id.)

The Court finds that Ms. Seredina has established a causal connection between her protected activities and her adverse employment action. Ms. Seredina expressed concerns about her accommodations in the weeks leading to her termination and even had a scheduled meeting with Gore to discuss those concerns. Even though Ms. Seredina was terminated shortly after she made gun signs at her supervisor, she has presented sufficient circumstantial evidence for a reasonable juror to find a causal connection that Gore terminated her employment for engaging in a protected activity.

If the plaintiff establishes a prima facie case, the burden shifts to the defendant who must articulate legitimate, non-discriminatory reasons for the challenged action. McDonnell Douglas, 411 U.S. at 802. If the defendant meets this burden, the plaintiff must finally show that the "reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Team Elec. Co., 520 F.3d at 1089 (internal citation and quotations omitted). As explained above, Ms. Seredina has demonstrated that Gore's stated reason for her termination may be pretextual. Accordingly, there remains a genuine dispute of material fact on the actual reason for Ms. Seredina's termination, thus, the Court denies Gore's Motion on her retaliation claim. (Doc. 84).

### C. Failure to Accommodate

The Court finds that Gore has demonstrated that as a matter of law that it made meaningful efforts to reasonably accommodate Ms. Seredina's disability. The ADA considers the failure to accommodate a discriminatory act if "the employee is a qualified individual, the employer receives adequate notice, and a reasonable accommodation is

available that would not place an undue hardship on the operations of the employer's business." Snapp v. United Transp. Union, 899 F.3d 1088, 2095 (9th Cir. 2018). Additionally, an "employer is not obligated to provide an employee the accommodation [an employee] requests or prefers, the employer need only provide some reasonable accommodation." Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1089 (9th Cir. 2002) (quotation marks and citation omitted).

Here, the parties do not dispute that Ms. Seredina is a qualified individual and that Gore received adequate notice of her disability. (Docs. 84; 88). Rather, the parties dispute the effectiveness of the accommodations and whether Gore adequately engaged in the interactive process. (Id.)

Gore contends that it provided effective accommodations, including providing an in-person interpreter for monthly and biweekly meetings. (Doc. 84 at 14). Gore further contends that if Ms. Seredina wanted to discuss something outside of these meetings, she could request an in-person interpreter and Gore would provide one. (Id.)For virtual daily meetings, Gore also provided closed captioning, which allowed Ms. Seredina to read what was being said, and provided Ms. Seredina with written materials and summaries of meetings. (Id.) Mr. Harrell also knew some ASL and interpreted for Ms. Seredina when an interpreter was not present. (Id.) Additionally, Gore set up a dedicated station for Ms. Seredina to use Sorenson, which she used to communicate at work through a live ASL interpreter.[5] (Id.) Ms. Seredina was allowed to use Sorenson whenever she wanted, and she alleges that there was only once that she was not. (Id.) Ms. Seredina also often communicated with coworkers, including Mr. Harrell, through written emails, instant messages, text messages, or handwritten notes, and lip reading. (Id.) Further, Gore allowed Ms. Seredina to teach biweekly ASL classes at the manufacturing plant, with help from an in-person interpreter, and paid Ms. Seredina and her coworkers for attending.[6] (Id.)

---

[5] Ms. Seredina also uses Sorenson to communicate outside of work. (Doc. 84 at 14).
[6] The Court notes that the ASL classes were arguably part of Ms. Seredina's formal job responsibilities. (Doc. 90 at ¶ 19).

Additionally, Ms. Seredina acknowledges that she did not need an interpreter to perform her job, and a full-time interpreter would not have been doing anything for nearly the entire time she was working. (Id.) Gore also contends that Ms. Seredina performed her job well for over 17 years and she never received any disciplinary action or negative performance reviews, which establishes that her accommodations were effective. (Id. at 14-15; Doc. 102 at 6).

Further, this Court has held that "Plaintiff's window to allege unlawful employment practice extends back to January 22, 2023, three hundred days prior" to the date of her Charge. (Docs. 80 at 11; 84 at 15). "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire" "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Id. The same is true for the denial of a request for accommodation. See Cherosky v. Henderson, 330 F.3d 1243, 1248 (9th Cir. 2003).

Gore contends that Ms. Seredina has identified only two meetings between January 22, 2023, and her termination on May 8, 2023, in which Gore allegedly failed to provide her with an in-person interpreter. (Doc. 84 at 15). Gore contends that the February 2, 2023, meeting was not one of the monthly, biweekly, or other regularly scheduled meetings. (Id. at 15-16). Gore contends that Mr. Harrell scheduled the meetings just two days earlier, it submitted a request for an interpreter and received booking confirmation. (Id. at 16). Gore contends, however, that the interpreter did not show up. (Id.) When Gore reached out to the servicing company, the company allegedly explained that it had not been able to secure an interpreter for that day and apologized for not informing Gore. (Id.) Gore also contends that Mr. Harrell tried his best to interpret for Ms. Seredina during the meeting through sign language and writing, and that Ms. Seredina did not express that she did not understand, nor did she seek to use Sorenson to communicate with Mr. Harrell about this meeting. (Id.)

Gore further contends that it was unable to secure an interpreter for the February 14, 2023, meeting because Ms. Seredina expressed interest in attending only 24 hours

before. (Id.) Gore contends that there was an option to attend this meeting virtually, it provided closed captions for the meeting, and that Mr. Harrell was available to interpret for Ms. Seredina and answer any questions through ASL, written notes, or Sorenson. (Id.) Gore contends that the two incidents Ms. Seredina identifies in the relevant time period are "*de minimis* incidents that do not detract from the significant accommodation efforts Gore made for 17 years." (Doc. 102 at 8).

Gore also argues that Ms. Seredina's argument that there was no interpreter for daily meetings at the start of each shift and the times her leaders would "sporadically" make announcements at the end of shifts is misleading. (Doc. 84 at 16). Gore contends that it provided Ms. Seredina closed captioning for the daily meetings, as well as written materials and summaries. (Id.) Gore also contends that Ms. Seredina never requested an interpreter for the daily stand-up meetings. (Doc. 102 at 8).

In response, Ms. Seredina contends that there is sufficient evidence that Gore's accommodations were ineffective. (Doc. 88 at 5). Specifically, Ms. Seredina contends that there was no interpreter for daily stand-up meetings from January 2023 through her termination and that Gore rarely provided written notes or other means of understanding what was discussed. (Id.) Further, Ms. Seredina contends that, for less frequent meetings, there was no effective backup solution when Gore's primary ASL vendor, based in Phoenix, could not attend due to last-minute requests or weather conditions. (Id.) Ms. Seredina also contends that Gore made last-minute requests for interpreters, despite several warnings from its interpreting vendor that it might not have any one available due to such late notice. (Id. at 5-6).

Additionally, Ms. Seredina contends Gore did not properly engage in the interactive process. (Doc. 88 at 6). For an employer to reasonably accommodate a disabled employee, the employer must participate in an interactive process for accommodation. Zivkovic, 302 F.3d at 1089. This process requires "(1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an

- 22 -

accommodation that is reasonable and effective." Id. An employer has an affirmative duty to suggest accommodations that would be effective. Humphrey, 239 F.3d at 1137. The duty to accommodate is "continuing" and "not exhaustive by one effort." Id. at 1138.

Here, although the interactive process is a continuing duty, which "extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed," Id., Ms. Seredina has not shown that Gore knew that the accommodations it offered when an in-person interpreter was not present— written materials and summaries, closed captions for virtual daily meetings, the opportunity to communicate with supervisors and others through Sorenson, ASL, emails, instant messages, text messages, and handwritten notes—were insufficient.

Ms. Seredina also contends that this case is like U.S. EEOC v. UPS Supply Chain Solutions. 620 F.3d 1103 (9th Cir. 2010). In UPS Supply Chain Solutions, the plaintiff was deaf and required ASL interpretations to understand the employer's meetings. Id. at 1105. While the plaintiff performed his job duties without an interpreter, the employer did not provide ASL interpreters for weekly meetings. Id. at 1106. Instead, the employer would have a coworker take notes and send overviews to plaintiff after the meetings. Id. But in that case, the employee presented evidence that he repeatedly requested in-person interpreters at the weekly meetings, but his employer refused to provide one. Id. The Ninth Circuit held that summary judgment was not appropriate because a reasonable jury could conclude that the accommodations were not effective. Id. at 1114.

Here, however, Ms. Seredina has not presented comparable facts. Ms. Seredina never requested an interpreter for the daily stand-up meetings, and Gore provided an in-person interpreter for nearly all the monthly and bi-weekly meetings. (Docs. 102 at 8; 84 at 14). Also, Ms. Seredina does not demonstrate that Gore knew or had reason to know that the accommodations it offered for the daily stand-up meetings were insufficient.

Accordingly, the Court finds that Ms. Seredina has failed to show that her accommodations were insufficient for her to perform the essential functions of her job. If

anything, the record demonstrates that Ms. Seredina was an outstanding employee and clearly capable of performing the essential functions of her job with the accommodations Gore already provided. Further, Ms. Seredina acknowledged that she performed the essential functions of her job for 17 years with the accommodations already in place. Thus, the Court grants Gore's Motion for Summary Judgment on Ms. Seredina's failure to accommodate claim.

## IV.    CONCLUSION

For the preceding reasons, the Court grants in-part and denies in-part Gore's Second Motion for Summary Judgment. (Doc. 84). The Court grants Gore's Motion on Ms. Seredina's failure to accommodate claim. But the Court denies the rest of Gore's Motion because there remain genuine disputes of material facts whether Gore's proffered reason for Ms. Seredina's termination is pretextual.

Accordingly, for the reasons set forth,

**IT IS ORDERED granting in-part and denying in-part** Defendant's Motion for Summary Judgment. (Doc. 84). Summary judgment is awarded to Defendant on Plaintiff's failure to accommodate claim. The Court denies summary judgment on Plaintiff's remaining claims.

**IT IS FURTHER ORDERED dismissing** Count III of Plaintiff's Fourth Amended Complaint for failure to accommodate under the ADA **with prejudice**. (Doc. 34).

Dated this 12th day of June, 2026.

_____
Stephen M. McNamee
Senior United States District Judge